JS 44 (Rev. 02/19) **CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**
Liberty Resources Inc; Disabled In Action of Pennsylvania, Inc.; Philadelphia ADAPT; Tony Brooks; Liam Dougherty; Fran Fulton; and Louis Olivo, on behalf of themselves and similarly situated persons

**DEFENDANTS**
City of Philadelphia

**(b)** County of Residence of First Listed Plaintiff   Philadelphia
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Philadelphia
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
DAVID FERLEGER, 413 Johnson St., Jenkintown, PA 19046, (215) 887-0123; DISABILITY RIGHTS ADVOCATES, 655 Third Ave., 14th Floor, (212) 644-8644.

Attorneys *(If Known)*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*    Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | **PERSONAL INJURY** | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury - Product Liability | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| | | | | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☒ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☒ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity):*
42 U.S.C. § 12131 et seq.; 29 U.S.C. § 794 et seq.

Brief description of cause:
Long term failure of City to provide accessible pedestrian rights of way for people with disabilities

**VII. REQUESTED IN COMPLAINT:**
☒ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

**VIII. RELATED CASE(S) IF ANY**
*(See instructions):*
See Pars. 8, 35 and 92, & Ex A to Complaint

JUDGE Hon. Harvey Bartle III     DOCKET NUMBER No. 92-4101.

DATE
August 26, 2019

SIGNATURE OF ATTORNEY OF RECORD

AUG 26 2019

**FOR OFFICE USE ONLY**

RECEIPT #     AMOUNT     APPLYING IFP     JUDGE     MAG. JUDGE

Print     Save As     Reset

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

19-3846

### DESIGNATION FORM
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: LIBERTY RESOURCES INC, 112 N. 8TH ST, PHILADELPHIA, PA

Address of Defendant: CITY HALL, PHILADELPHIA, PA

Place of Accident, Incident or Transaction: PHILADELPHIA, PA

---

**RELATED CASE, IF ANY:** 812 F. Supp. 547, 553. (E.D. Pa. 1993), aff'd, 9 F.3d 1067 (3d Cir. 1993). See Pars. 8, 35 and 92, & Ex A of Complaint

Case Number: No. 92-4101        Judge: Hon. Harvey Bartle III        Date Terminated: Perm Injunction 5/23/94

Permanent injunction, 5/23/1994

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?   Yes ☑   No ☐

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?   Yes ☑   No ☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?   Yes ☐   No ☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?   Yes ☐   No ☑

I certify that, to my knowledge, the within case ☐ is ☑ is **not** related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: August 26, 2019                                         Pa 15699

*Attorney-at-Law / Pro Se Plaintiff*        *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

A. *Federal Question Cases:*

1. Indemnity Contract, Marine Contract, and All Other
2. FELA
3. Jones Act-Personal Injury
4. Antitrust
5. Patent
6. Labor-Management Relations
7. Civil Rights
8. Habeas Corpus
9. Securities Act(s) Cases
10. Social Security Review Cases
11. ☑ All other Federal Question Cases
   *(Please specify):* ADA, 42 U.S.C. § 12131 et s

THIS CASE IS RELATED TO: 92 CV 4101

CIVIL ACTION NO.
CRIMINAL NO.

ASSIGNED TO: Judge Bartle

*(The effect of this certi...*

---

David Ferleger , counsel of record *or* pro se plaintiff, do hereby certify:

☐ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☑ Relief other than monetary damages is sought.

AUG 26 2019

DATE: August 26, 2019                                         Pa 15699

*Attorney-at-Law / Pro Se Plaintiff*        *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ. 609 (5/2018)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| **Liberty Resources. Inc., et al.** | : | CIVIL ACTION |
| v. | : | |
| **City of Philadelphia** | : | NO. 19- 3846 |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.                     ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.                           ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2. ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.                                                                    ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court. (See reverse side of this form for a detailed explanation of special
    management cases.)

(f) Standard Management – Cases that do not fall into any one of the other tracks.          (X)

| | | |
|---|---|---|
| **August 26, 2019** | David Ferleger | **Plaintiffs** |
| **Date** | **Attorney-at-law** | **Attorney for** |
| **215 887 0123** | | **david@ferleger.com** |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

AUG 26 2019

# UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LIBERTY RESOURCES, INC.; DISABLED IN ACTION OF PENNSYLVANIA, INC; PHILADELPHIA ADAPT; TONY BROOKS; LIAM DOUGHERTY; FRAN FULTON; and, LOUIS OLIVO;<br><br>          Plaintiffs,<br><br>-against-<br><br>THE CITY OF PHILADELPHIA,<br><br>          Defendant. | **COMPLAINT – CLASS ACTION**<br><br>19 - 3846 |

DISABILITY RIGHTS ADVOCATES
655 Third Avenue, 14th Floor
New York, NY 10017-5621
Tel: (212) 644-8644
Fax: (212) 644-8636

DAVID FERLEGER
413 Johnson Street
Jenkintown, PA 19046
Tel: (215) 887-0123

*Attorneys for Plaintiffs*

1

## INTRODUCTION

1.     Philadelphia's sidewalks are dilapidated, disintegrating, and teeming with obstructions, making every-day travel difficult and dangerous for the thousands of people with disabilities that call Philadelphia home.

2.     Philadelphia has the largest prevalence of people with disabilities of any major city in the United States, yet the City of Philadelphia ("the City") has shirked its duty to these citizens for nearly three decades by failing to provide accessible pedestrian rights of way in violation of Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Section 504").

3.     Because Philadelphia's pedestrian rights of way—including curb ramps, sidewalks, crosswalks, pedestrian crossings, and other walkways—are rife with barriers, people with disabilities that affect their mobility cannot travel freely around Philadelphia, hindering their right to work, study, socialize, volunteer, worship, and engage in civic life.

4.     For example, many corners exhibit barriers such as curb ramps that are broken, steep, crumbling, or have missing or inadequate detectable warnings—a feature that assists people who are blind or have low vision to identify when the sidewalk ends in order to avoid walking into vehicular lanes.  Some corners are missing curb ramps altogether so that individuals who use wheelchairs are unable to utilize the sidewalk.

5.     These barriers not only make independent travel difficult or impossible; they have caused members of the proposed class to suffer bodily injury as a result of falling out of wheelchairs and tripping over obstacles.

6.     Meanwhile, pervasive obstructions block pedestrian rights of way for people with disabilities that affect their mobility.  For example, Philadelphia fails to enforce parking laws, allowing an unprecedented and extreme situation of drivers parking their cars on sidewalks and

in crosswalks on a regular and reoccurring basis. Vendor sandwich boards, trash cans, and sidewalk furniture are placed in the path of travel with impunity. People who are blind or have low vision routinely run into these obstructions and people who use wheelchairs often cannot pass without moving into the street traffic lane.

7.      Defendant's decades-long disregard for its obligations under federal accessibility laws denies people with disabilities access to a safe, unencumbered route of travel on the sidewalks of Philadelphia.

8.      In February 1993, this Court issued a class-wide injunction in *Kinney v. Yerusalim*, ordering that the City "shall install curb ramps or slopes on every City street, at any intersection having curbs or other barriers to access, where bids for resurfacing were let after January 26, 1992." 812 F. Supp. 547, 553 (E.D. Pa. 1993) (Hon. Harvey Bartle III), affirmed, *Kinney v. Yerusalim*, 9 F.3d 1067 (3d Cir. 1993). The Court supplemented its February 2, 1993 Order shortly thereafter, further ordering that, "as [the City] resurfaces streets in the future, [it] shall install said curb ramps or slopes at the time the street is resurfaced." *Kinney v. Yerusalim*, Civ. No. 92-4101 (E.D. Pa. May 23, 1994)[1]. The violations of law described in this Complaint also comprise violations of the injunction in *Kinney*.

9.      Tony Brooks; Liam Dougherty; Fran Fulton; Louis Olivo; Liberty Resources, Inc.; Disabled In Action of Pennsylvania, Inc.; and Philadelphia ADAPT (collectively, "Named Plaintiffs") bring this class action on behalf of themselves and all persons with disabilities or impairments that affect their mobility who use or will use pedestrian rights of way in the City of

---

[1] A reproduction of this Order, obtained at the National Archives at Philadelphia, is attached hereto as Exhibit A.

3

Philadelphia to end Defendant's decades-long civil rights violations. Plaintiffs do not seek monetary damages.

10.     On July 22, 2019, in a final attempt to resolve this matter without resort to litigation, plaintiffs' counsel sent a demand letter to the City explaining the violations alleged in this Complaint and inviting negotiations. The City has not responded.

## JURISDICTION

11.     This is an action for declaratory and injunctive relief, brought pursuant to Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*; and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.*

12.     This Court has jurisdiction over claims arising under Title II and Section 504 pursuant to 28 U.S.C. sections 1331 and 1343.

13.     This Court has jurisdiction to issue a declaratory judgment pursuant to 28 U.S.C. sections 2201 and 2202.

## VENUE

14.     Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(b), because Defendant is located within this District and the events or omissions giving rise to the claims alleged herein occurred in this District.

## PARTIES

15.     Plaintiff Tony Brooks lives in Philadelphia and uses a wheelchair for mobility because of a disability.

16.     Plaintiff Liam Dougherty lives in Philadelphia and uses a wheelchair or a scooter for mobility because of a disability.

17.     Plaintiff Louis Olivo lives in Philadelphia and uses a wheelchair for mobility because of a disability.

4

18.     Plaintiff Fran Fulton lives in Philadelphia and uses a white cane for mobility because of a disability.

19.     Plaintiff Liberty Resources, Inc. ("Liberty Resources") is an independent living center located in Philadelphia that serves persons with disabilities throughout the city. Founded in 1980, Liberty Resources is a non-profit, consumer-controlled organization that advocates and promotes independent living for all persons with disabilities, serving more than 4,000 consumers in Philadelphia. The vast majority of Liberty Resources' board members and staff are persons with disabilities. Liberty Resources' constituents and staff are directly affected and harmed by Defendant's violations of law described in this Complaint.

20.     Plaintiff Disabled in Action of Pennsylvania, Inc. ("DIA-PA"), a non-profit corporation incorporated in the Commonwealth of Pennsylvania, is led by people with disabilities. DIA-PA is dedicated to advocating on behalf of the disability community. DIA-PA's primary organizational function is to assist persons with disabilities in achieving equality with nondisabled persons and to advocate on behalf of and with persons with disabilities to eradicate discrimination against people with disabilities in all aspects of community life. Ensuring access to pedestrian rights of way is critical to DIA-PA's mission. In addition, DIA-PA's participants use and want to use the City's pedestrian right of way system and are harmed by the violations of law described in this Complaint.

21.     Plaintiff Philadelphia ADAPT ("Philly ADAPT") is the local chapter of a national grass-roots community that organizes disability rights activists to ensure the civil and human rights of people with disabilities to live in freedom. Access to the City's pedestrian right of way system is critical to Philly ADAPT's mission because it promotes freedom of movement and independence for individuals with disabilities. In addition, sidewalks are a prominent place for

Philly ADAPT activists' public speech activities. Members of Philly ADAPT are directly affected and harmed by the violations of law described in this Complaint.

22.     Defendant the City of Philadelphia is a local government entity that provides a pedestrian right of way program in the form of an extensive network of sidewalks, curb ramps, crosswalks, and other pedestrian paths of travel throughout Philadelphia. The City is responsible for constructing, maintaining, repairing, and regulating this system of pedestrian rights of way.

23.     Presently, and at all times relevant to this Complaint, Defendant has been a "public entity" within the meaning of Title II of the ADA and has received federal financial assistance within the meaning of the Rehabilitation Act.

## FACTUAL ALLEGATIONS

### A.     The City of Philadelphia is in Violation of its Legal Obligation to Ensure Accessible Pedestrian Rights of Way

24.     Philadelphia's pedestrian rights of way system, including sidewalks and curb ramps, is a public program, service, and/or activity that the City provides for the benefit of its residents and visitors.

25.     The City maintains these pedestrian paths of travel in a way that discriminates against people with disabilities that affect mobility.

26.     For over forty years, first under Section 504 and later under Title II of the ADA, the City has been required to take affirmative steps to make its sidewalks accessible to persons with disabilities.

27.     Further, Philadelphia must maintain the accessibility of its sidewalks and curb ramps and repair or replace curb ramps that are not compliant with accessibility standards whenever it repaves the adjoining street.

28.     Since 1991, the ADA Standards of Accessible Design have set out specific construction standards for curb ramps and pedestrian routes. These standards must be met to ensure they provide accessible passage for people with disabilities navigating the sidewalks.

29.     Yet, the sidewalks, curb ramps, crosswalks, and other paths of pedestrian travel throughout Philadelphia are in a shocking state of disrepair and disintegration, and fail to meet the legally required criteria under federal disability law.

30.     Philadelphia also creates or ignores pervasive barriers obstructing pedestrian paths of travel.  Pedestrian rights of way are frequently narrowed significantly or blocked entirely by objects such as parked cars, vendor sandwich boards, trash cans, restaurant furniture, and other protrusions.

31.     Obstructions also include construction blocking pedestrian rights of way without clear, accessible, safe alternate routes.

32.     In winter, improper snow removal causes yet another barrier, resulting in far more than the isolated or temporary interruptions allowed by law.  Indeed, snow is frequently shoveled off sidewalks onto curb ramps, causing tall pile-ups—sometimes multiple feet high—that entirely block people with disabilities from getting onto or off of the sidewalk.

33.     As a result of these obstructions, people with disabilities that affect mobility often are unable to get onto, off of, or through city blocks safely.  They cannot navigate the city independently and comfortably.

34.     The ADA set out a specific obligation for municipalities such as the City to assess the state of their pedestrian rights of way and create a plan for remediation of barriers by mid-1992—known as a Transition Plan; Philadelphia has no record of either.

7

35.     In mid-2014, the City's Streets Department notified DIA-PA and Philly ADAPT that it would discontinue ramp upgrades during repaving—blatantly flouting civil rights laws and the court's order in *Kinney v. Yerusalim*—and transition to a fully request-based system called the "Curb Ramp Partnership Program."

36.     At that time, the City estimated that nearly 72,000 curb ramps needed to be upgraded at $7,500 per ramp, but planned to dedicate only $3.2 million for ramp upgrades each year.  Thus, it would take almost 170 years to upgrade the local network of curb ramps to ADA compliance under the "Curb Ramp Partnership Program."

**B.      Barriers in Philadelphia's Pedestrian Rights of Way System Cause Harm to Individuals with Disabilities that affect Mobility**

37.     The prevalence of barriers throughout Philadelphia's network of pedestrian rights of way makes daily life unsafe, time-consuming and frustrating for Named Plaintiffs Tony Brooks, Liam Dougherty, Louis Olivo, and Fran Fulton, as well as other people with disabilities that affect their mobility who use or try to use pedestrian paths of travel in Philadelphia.

38.     Plaintiffs routinely fall or sustain other injuries due to sidewalk barriers by simply trying to go to work, school, volunteer activities, or to visit family and friends.

39.     Plaintiffs must ensure extra time and advanced planning to make normal trips out, and are often detoured due to temporary and permanent barriers on their routes.

40.     Pervasive barriers on paths of travel impede the normal day-to-day needs for individuals with disabilities who seek to shop, go to school, work, or attend appointments.  They are further deterred from social activities, exploring the city, and engaging in the community.

*Tony Brooks*

41.     Plaintiff Tony Brooks has a disability that requires him to use a wheelchair for mobility.

42.     As a result of barriers in the pedestrian right of way, Mr. Brooks has experienced injuries and delay.  For example, he has flipped over in his wheelchair due to uneven sidewalks and curb ramps many times, causing head injuries, aching limbs, bruises, and scrapes.

43.     In October 2018, Mr. Brooks was traveling from the north side of Broad Street crossing Kennedy Boulevard towards City Hall and encountered a curb ramp that was so steep that when he attempted to go up it, he flipped backwards in his chair, causing him scrapes on his elbows and wrists.  He had ongoing pain in his elbows for months after that fall.

44.     Mr. Brooks has experienced extensive barriers along the sidewalks in Chinatown, especially on Arch Street between Broad Street and 9th Street.  He recently visited this area to attend a convention at the convention center, and frequently comes to this neighborhood to go grocery shopping and eat at restaurants.  Throughout this area, Mr. Brooks has had to navigate over crumbling sidewalks, missing curb ramps, and sidewalks with excessive cross-slopes.

45.     There is no accessible pedestrian route leading to and from Mr. Brooks' home. The sidewalks directly in front of his apartment on Vine and 56th Street are bumpy, the curb ramps are uneven, and for many years there was a large pothole in the middle of the crosswalk that continued to deteriorate and was only fixed this year when the street was repaved.

46.     In addition, the poor condition of the sidewalks on the blocks surrounding his apartment and along 63rd Street between Market and Vine Street results in Mr. Brooks traveling in bicycle or vehicle lanes to avoid barriers.  This is dangerous, and Mr. Brooks is afraid that drivers frequently do not seem to be paying close attention to wheelchair users in bike lanes and intersections.

*Liam Dougherty*

47.     Plaintiff Liam Dougherty has a disability that requires him to use a wheelchair or scooter for mobility.

9

48.     In 2015, Mr. Dougherty was traveling on the sidewalk near City Hall using his scooter and had to swerve to avoid a pedestrian but hit a crack or bump in the route. He fell out of his scooter, hit his head, and had to be taken to a medical facility via ambulance where he received stitches for a cut on his forehead. Ever since this incident, Mr. Dougherty has prioritized mobility devices with seatbelts due to the risk posed by barriers in the sidewalks.

49.     When Mr. Dougherty moved into his current home in West Philadelphia, the sidewalks on his block were in a terrible state of disrepair. Thereafter, the City redid the sidewalks on both sides of the block, but the neighborhood has since seen an increase in construction that has severely degraded the accessibility of the sidewalks, without action from the City to sufficiently address the problem.

50.     Construction crews drive and park bulldozers, trucks, and other large vehicles on the sidewalks. This not only blocks the pedestrian route such that Mr. Dougherty must travel in the street, but also causes significant damage to the sidewalks. In one location the sidewalk broke in the middle, leaving a valley approximately four inches deep that Mr. Dougherty got caught in when trying to navigate on the path. He felt lucky that he could use his legs to push off and free himself. If this had not been the case, he would have had to wait for a passerby to assist him. The sidewalk was left dangerously broken for more than six months.

51.     Other locations in West Philadelphia have also been a problem. In December 2017, Mr. Dougherty's power chair tipped over on its side when he tried to traverse a part of the sidewalk that was very broken up and uneven with several holes. He broke the fall with his hands, but could not flip his approximately 250-pound chair from its side. He was stranded for about 10 minutes until a stranger came by who could help him. Mr. Dougherty feels lucky to have only suffered scrapes on this occasion.

10

52.     In West Philadelphia, Mr. Dougherty encounters so many barriers in the pedestrian rights of way that he frequently is forced to travel in bike and traffic lanes to avoid them.  For instance, on his commute to and from the Market-Frankford Line, Mr. Dougherty frequently travels on 48th Street and must roll in the bike lane for the three-quarter mile stretch from Market Street to Baltimore Avenue due to the critical state of the sidewalks and curb ramps.

53.     Traveling in the bike lane is dangerous and uncomfortable for Mr. Dougherty, in part because the pavement in the bike lanes is also frequently in poor shape.  In 2015, Mr. Dougherty was traveling in the bike lane in West Philadelphia using his scooter for mobility when he hit a spot where the asphalt was uneven in the middle of the bike lane, causing him to fall out of his scooter and injure his hands where he braced himself from the fall.

54.     When Mr. Dougherty travels in the bike lane, it is also dangerous for motorists and bicyclists. On one occasion, a bicyclist attempted to go around Mr. Dougherty in the bike lane and fell when they caught the adjacent trolley tracks.

55.     Mr. Dougherty frequently travels with his one-year-old daughter in a carrier in his lap.  His biggest fear is getting the wheels of his wheelchair or scooter stuck on an uneven patch of sidewalk or a broken curb ramp and falling out of his chair while holding his daughter.

56.     Mr. Dougherty has also struggled with inaccessible, dangerous sidewalks near his church, narrow sidewalks and steep curb ramps near a theater where he has taken improvisational acting classes, and steep cross-slopes in Chinatown and near Rittenhouse Square.

57.     Mr. Dougherty would like to visit the restaurants, coffee shops, and bars in the Fairmount area where he grew up, but is deterred from going there as often as he would like because of the poor state of the pedestrian rights of way in that neighborhood.

58.     In addition, when Philadelphia experiences a heavy snow, it is nearly impossible for Mr. Dougherty to get to work because the snow either does not get shoveled or it gets shoveled onto the curb ramp where it is left.

**Fran Fulton**

59.     Plaintiff Fran Fulton is blind and uses a white cane to navigate pedestrian routes.

60.     Ms. Fulton has lived in Philadelphia for 47 years and currently lives in the Center City neighborhood.  She frequently encounters barriers such as broken sidewalks and dangerous curb ramps that make her feel unsafe traveling in the sidewalks.

61.     While Ms. Fulton is an experienced, adept cane-user, the poor condition of the sidewalks throughout Philadelphia makes it very difficult for her to get around independently and slows her down significantly.  She has found it increasingly frustrating to navigate around Center City—the neighborhood where she has lived for fourteen years.

62.     Ms. Fulton struggles with uneven and broken sidewalks throughout Philadelphia. Such barriers have caused Ms. Fulton to fall countless times.  She has suffered sprained ankles, skinned knees, and multiple scars.

63.     Philadelphia's many brick sidewalks are especially difficult for Ms. Fulton to walk on when the bricks get wet or come loose.

64.     After a recent visit to a friend at the corner of Broad and Vine Streets, Ms. Fulton walked over to 15th Street and then down to Race Street.  The conditions of the sidewalk along this route were so bad that both Ms. Fulton and her friend, who uses a scooter, had to move very slowly and found it almost impossible to traverse.

65.     Recently, Ms. Fulton and a friend who uses a wheelchair were walking westward on Chestnut Street and turned right onto 21st Street to visit an apartment building that a friend's son had recently rented.  The sidewalks were so broken up and uneven that Ms. Fulton and her friend were only able to walk partway down the block before they had to turn around, unable to reach the apartment building.

66.     Every Tuesday, Ms. Fulton travels to the federal office building at 2nd Street and Chestnut Street to attend a rally with other activists in front of her senator's office.  Ms. Fulton frequently encounters construction in this neighborhood.  In order to take the bus home from the rallies, Ms. Fulton must cross Chestnut Street and stand on 2nd Street, then navigate a curb cut where the bus is that is bumpy and uneven.

67.     Potholes in crosswalks are a common problem for Ms. Fulton.  For example, in mid-March, Ms. Fulton crossed into the intersection at Juniper and Walnut Street and fell into a pothole, scraping her arms and knees and twisting her ankle.  Additionally, at the intersection of 17th Street and Walnut Street there are significant potholes and cracked pavement in the crosswalk from the northwest corner to the southwest corner.  These barriers make it difficult for Ms. Fulton to cross Walnut Street.

68.     Ms. Fulton must navigate very cautiously on the City's many curb cuts that are broken up or at a very steep angle.  She does so with trepidation because these can cause her to trip and fall.  Her cane can follow the curb cuts but when they are very steep, she cannot walk down them without feeling like she is going to fall forward.  For example, the northeast and northwest corners of the intersection of Chestnut Street and Juniper Street have curb cuts that are hard to navigate.  Additionally, the neighborhood surrounding Ludlow Street between 11th Street

13

and 17th Street, which features numerous restaurants, has several bad curb cuts that make it difficult to travel safely throughout that neighborhood.

69.     Ms. Fulton also commonly encounters "fake" curb cuts, often on small side streets—including on 12th Street and Walnut Street, and on 19th Street and Commerce Street. These "fake" curb cuts are just poured concrete filling in the space from the curb to the street, causing them to be uneven and too steep.

70.     Ms. Fulton has also encountered curb cuts that lack a tactile warning, such that she does not know when she is stepping off the sidewalk and into the roadway.

71.     Ms. Fulton also has trouble with the many corners in which there is only one curb cut pointing directly into the middle of the intersection, rather than two curb cuts pointing towards each crosswalk.  On corners with only one central curb cut—including the northeast corner of 19th Street and Chestnut Street, which also lacks a tactile warning—Ms. Fulton is unable to safely determine where the crosswalk is.

72.     Ms. Fulton has difficulty navigating in areas where restaurants place tables, chairs, and signage in such a way that they protrude into the sidewalk because she walks into them, bumps into them, and knocks them over.  This has been an increasingly common experience for Ms. Fulton in the past five years.

73.     Near Ms. Fulton's home, cars are often parked on the sidewalks and crosswalks, blocking her from passing them on the pedestrian path.  Additionally, trucks frequently use the crosswalks as loading or unloading zones, making it impossible for Ms. Fulton to cross the street. Ms. Fulton also regularly encounters parked cars on sidewalks and crosswalks at the corner of 9th Street and Walnut.  When a parked car blocks the curb ramp or sidewalk, Ms. Fulton is forced to walk in the street, where she fears being hit by passing bikes and cars.

74.     Ms. Fulton's route is often obstructed by construction zones that block the pedestrian right of way.  Because of inadequate warnings and information about accessible alternate paths, Ms. Fulton cannot safely and independently navigate around construction. Sometimes she will start walking down a block and someone will shout at her that it is closed at the other end, leaving her with very little guidance as to how she should proceed.  Other times, she may need to request a stranger's help to navigate around a construction zone.  And often, she simply runs into the construction blockades with her white cane and is forced to choose between crossing the street in the middle of the block or backtracking all the way to the last intersection. Because of the frequency of construction barriers in Philadelphia, Ms. Fulton often finds that walks that should take ten to fifteen minutes take more like twenty-five to thirty minutes. For example, Ms. Fulton recently encountered a construction zone at the northeast corner of 6th Street and Market by Independence Mall.  She was trying to cross from the east side to the west side of 6th Street but was unable to find a way around the construction until someone offered to personally assist her across the street.

***Louis Olivo***

75.     Plaintiff Louis Olivo has a disability that requires him to use a wheelchair for mobility.

76.     He has lived in Philadelphia for 57 years and encounters barriers in the pedestrian rights of way nearly every day as he tries to navigate around the City to go to work, visit family, volunteer, and run errands.

77.     Mr. Olivo lives near the intersection of 56th and Vine Streets and travels throughout Philadelphia almost daily.  He regularly encounters inadequate, dangerous and missing curb ramps that interfere with or prevent his travel.

78.     Mr. Olivo often shops and does his laundry at the plaza across the street from his home.  For over a year, in the crosswalk at 56th and Vine on the way to the plaza, he encountered a dangerous pothole, about two-feet-by-two-feet, which typically filled with water and frequently ejected rocks and debris as cars drove over it.

79.     Mr. Olivo takes the El to Bridge Street and Pratt every week to visit his 72-year-old mother in Northeast Philadelphia.  Mr. Olivo also frequently travels to the Gray's Ferry area in South Philadelphia and to North Philadelphia for personal and social reasons.  When he travels to these areas, he encounters inadequate curb cuts that dangerously interfere with his travel.

80.     Mr. Olivo regularly travels to downtown Philadelphia for volunteer work and to patronize stores and restaurants.  Inadequate and dangerous curb cuts, such as those on Market Street at 7th, 9th and 12th Streets, interfere with his travel and are dangerous to his well-being. He and his personal care aide often go to the aide's agency at 601 Market (from Mr. Olivo's 8th Street workplace), and have to pass through the defective curb cuts at the 7th and Market Street intersection.

81.     Similarly, his path of travel to the Social Security Agency contains multiple barriers.

82.     There are no curb cuts at 13th Street and Sansom or at 3rd Street and Cherry Street, forcing Mr. Olivo to roll additional distance out of his way in order to travel from one sidewalk block to another.

***Organizational Plaintiffs***

83.     Plaintiff Liberty Resources has consumers with disabilities that affect their mobility who reside in, work in, and/or regularly travel to Philadelphia.  Liberty Resources also has many staff members, board members, and volunteers who have disabilities that affect their mobility.

16

84.     Liberty Resources' consumers, staff members, board members and volunteers have used, and will continue to use Philadelphia's pedestrian rights of way, but are impeded by the pervasive barriers.

85.     The City's failure to provide accessible pedestrian rights of way has caused Liberty Resources to dedicate staff time and organizational focus to evaluating and addressing barriers that limit access to pedestrian routes for its employees and consumers. For example, Liberty Resources has engaged in public advocacy with the City for many years on this issue through correspondence to and meetings with City officials, providing testimony at City Council meetings, and submitting requests for barrier remediation on behalf of Liberty Resources' consumers.

86.     Likewise, Liberty Resources' consumers struggle to safely reach Liberty Resources' services and its advocacy and community events due to barriers in the City's pedestrian rights of way. Liberty Resources' consumers find it unduly difficult to travel safely around Philadelphia to get to meetings, medical appointments, and cultural activities, all of which Liberty Resources encourages as aspects of independent living. Defendant's failure to design and maintain accessible sidewalks and pedestrian routes thus impairs Liberty Resources' mission.

87.     The City's failure to maintain accessible sidewalks following snow events also directly impacts Liberty Resources. Many of its staff members are prevented from traveling to work entirely due to the lack of snow removal from curb cuts. This is also true for consumers who need to access Liberty Resources' services. On at least one occasion, after multiple unsuccessful attempts to secure the City's action to clear snow piled on curb cuts surrounding key transportation hubs downtown, Liberty Resources' Executive Director and other staff

members took it upon themselves to shovel the snow off of these curb cuts so that the organization's staff could get to work and its' consumers could access important services.

88.     In June 2018, Liberty Resources representatives met with the City's ADA Coordinator, Daniel Lopez[2], to discuss various concerns related to the City's provision of services to individuals with disabilities, including the City's failure to adequately construct and maintain accessible curb ramps.

89.     A follow-up meeting with the Streets Department was scheduled for late July, and, in advance, Liberty Resources sent Mr. Lopez a list of questions and concerns to be discussed, including:

> "We want to know about the priority list of curb cuts for the city and get an update on: which/ how many have been fixed, which are still in the pipeline, which are on the list, how do calls to 311 play into this, and what is the process to follow up with calls? Who is the keeper of the list and responsible to complete the curb cuts? What is the yearly budget for curb cuts in 2018? 2017? 2016?"

90.     The City ultimately cancelled this follow-up meeting and instead the Deputy Diversity and Inclusion Officer, Nefertiri Sickout, sent Liberty Resources a "preliminary written response" including some summary figures regarding service requests received by the ADA Unit and "upgraded" curb ramps.

91.     On August 2, 2018, Liberty Resources sought to address another problem with the City—a number of recently-installed truncated dome surfaces were breaking apart and becoming a dangerous barrier for Liberty Resources' staff and consumers.  Liberty Resources sent City officials photographs of locations where this was taking place and expressed concern that this was a more systemic problem.

---

[2] Mr. Lopez was the City's ADA Coordinator from approximately January 2018 to August 2018.

92.     Plaintiff DIA-PA has been advocating for accessible pedestrian rights of way in Philadelphia for decades.  Shortly after the passage of the ADA, DIA-PA brought litigation against the City to enforce its obligation to install curb ramps in conjunction with street resurfacing projects.  Although the litigation was successful—resulting in one of the earliest precedents regarding cities' obligations to ensure that their sidewalk programs are accessible[3]— the City has returned to its discriminatory practice of failing to install and maintain accessible curb ramps and sidewalks.

93.     As part of Philly ADAPT's disability rights activism, the organization has partnered with DIA-PA to engage City representatives in various capacities with the goal of securing greater accessibility throughout the City's pedestrian rights of way.

94.     DIA-PA and Philly ADAPT have spent the past several years attempting to informally collaborate with the City to develop solutions to the critical condition of Philadelphia's pedestrian rights of way.

95.     From approximately 2009 through 2014, representatives of DIA-PA and Philly ADAPT met with City representatives on a regular basis to discuss the disability community's concerns regarding various transportation related issues.  These meetings were facilitated by the City's Deputy Mayor of Transportation & Utilities, Rina Cutler.

96.     During these meetings, DIA-PA and Philly ADAPT frequently raised concerns regarding inaccessible sidewalks and missing curb ramps.

97.     In 2014, rather than committing to comprehensive, systemic action on these issues the City offered only ad-hoc remediation of barriers via a request program.

---

[3] *See* ¶ 8, *supra.*

98.     Since 2014, DIA-PA and Philly ADAPT have continued to advocate for the City

to prioritize accessibility in the pedestrian rights of way, including by providing testimony at city

council meetings, engaging in discussions with Councilmember Helen Gym's office regarding

the need for greater accessibility when construction temporarily blocks sidewalks, and

advocating for the City to fill the City ADA Coordinator position that had been vacant since

approximately 2000.

## CLASS ALLEGATIONS

99.     Pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, Plaintiffs bring

this action on their own behalf and on behalf of all persons similarly situated for injunctive and

declaratory relief.  Plaintiffs do not seek money damages.

100.    The class that Plaintiffs seek to represent consists of all persons with disabilities

or impairments that affect their mobility—including, for example, people who use wheelchairs or

other mobility devices, as well as those who are blind or have low vision—and who use or will

use pedestrian rights of way in the City of Philadelphia.

101.    The persons in the class are so numerous that joinder of all such persons is

impracticable and the disposition of their claims in a class action is a benefit to the parties and to

the Court.  Indeed, data from the United States Census American Community Survey indicates

that more than 138,000 non-institutionalized Philadelphia residents have an ambulatory difficulty

and more than 48,000 non-institutionalized Philadelphians have a vision difficulty.[4]  In addition,

many thousands of persons with disabilities that affect mobility visit Philadelphia annually.

---

[4] U.S. Census Bureau, 2013-2017 Am. Cmty. Survey 5-Year Estimates,
https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_17_5YR_S1810
&prodType=table.

102.    Common questions of law and fact predominate, including questions raised by Plaintiffs' allegations that the City has failed to provide meaningful access to Philadelphia's pedestrian right of way program to persons with impairments that impact mobility in violation of Title II of the ADA and Section 504.

103.    Common questions also include whether Defendant's system-wide policies have resulted in their failure to provide compliant, accessible curb ramps whenever they resurface or alter streets and their failure to ensure that their sidewalk program is kept free of obstacles—including broken pavement, protruding objects, construction zones, and piled snow—impeding the access of people with disabilities that affect mobility throughout Philadelphia.

104.    Named Plaintiffs' claims are typical of the claims of the class as a whole because the Plaintiffs are similarly affected by Defendant's failure to provide access to Philadelphia's pedestrian rights of way.

105.    Named Plaintiffs are adequate class representatives because they, or the persons they serve, are directly impacted by Defendant's failure to provide program access to Philadelphia's pedestrian right of way program.  The interests of the Plaintiffs are not antagonistic to, or in conflict with, the interests of the class as a whole.

106.    The attorneys representing the class are highly trained, duly qualified, and very experienced in representing plaintiffs in civil rights class actions for injunctive relief.

107.    Defendant has acted and/or failed to act on grounds generally applicable to the class as a whole, thereby making appropriate final declaratory and injunctive relief with respect to the class as a whole.

108.    References to Plaintiffs shall include each Named Plaintiff and each member of the class, unless otherwise indicated.

**FIRST CAUSE OF ACTION**
**VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT**
**(42 U.S.C. § 12131, *et seq.*)**

109.    Plaintiffs re-allege and incorporate herein all previously alleged paragraphs of the Complaint.

110.    Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, prohibits a public entity from excluding a person with a disability from participating in, or otherwise benefitting from, a program of the public entity, or otherwise discriminating against a person on the basis of disability:  "No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

111.    Named Plaintiffs Brooks, Dougherty, Fulton, and Olivo, and the consumers, staff, and board members of Named Plaintiffs Liberty Resources, Philly ADAPT, and DIA-PA are qualified to participate in the City's pedestrian right of way program and have disabilities within the meaning of the ADA.

112.    A "public entity" includes state and local governments, their agencies, and their instrumentalities.  42 U.S.C. § 12131(1).

113.    Defendant the City of Philadelphia is a public entity within the meaning of 42 U.S.C. § 12131 and 28 C.F.R. § 35.104.

114.    During all times relevant to this complaint, the City of Philadelphia has employed fifty or more persons.

115.    Title II of the ADA requires public entities, including the City, to operate each of its programs, services, or activities "so that, when viewed in its entirety, it is readily accessible to and useable by individuals with disabilities." 28 C.F.R. § 35.150; *see also* 28 C.F.R. §§ 35.149 & 35.151.

116.    Pedestrian rights of way themselves constitute a vital program, service or activity under Title II of the ADA.  28 C.F.R. § 35.104.

117.    Defendant has failed to provide persons with impairments that affect mobility meaningful access to its pedestrian rights of way program in Philadelphia, in violation of Title II of the ADA.

118.    Defendant has also failed to operate its pedestrian rights of way program in Philadelphia so that it is readily accessible to and usable by persons with impairments that affect mobility when viewed in its entirety, in violation Title II of the ADA.

119.    Title II of the ADA requires that when a public entity newly constructs facilities or alters any existing facilities in any manner that affects the usability of such facilities, the newly constructed or altered portions must be made accessible to and usable by individuals with disabilities. 28 C.F.R. § 35.151(b).  Title II's implementing regulations specifically require a public entity to install compliant curb ramps at intersections whenever it newly constructs or alters sidewalks, streets, roads, and/or highways at any time after January 26, 1992.  28 C.F.R. § 35.151(e).  A street resurfacing project by a public entity is an alteration triggering sidewalk and pedestrian route accessibility requirements under the meaning of the regulation.  *Kinney v. Yerusalim*, 9 F.3d 1067, 1073-74 (3d Cir. 1993).

120.    Defendant has failed to install adequate and compliant curb ramps in compliance with the ADA Standards for Accessible Design when newly constructing or altering sidewalks, streets, roads, and/or highways throughout Philadelphia, in violation of Title II of the ADA.

121.    The regulations implementing Title II of the ADA also require a public entity to maintain the features of all facilities required to be accessible under the ADA.  28 C.F.R.

§ 35.133. Facilities required to be accessible include roads, walks, and passageways. *See* 28 C.F.R. § 35.104.

122.    Defendant has failed and continues to fail to maintain accessible features on pedestrian rights of way throughout Philadelphia, including failing to fix deteriorating and heaving pavement and concrete, failing to remove protruding and/or moveable obstructions, and failing to ensure sufficiently wide paths of travel, among other failures to maintain accessible features of such facilities, in violation of Title II of the ADA.

123.    Defendant has also failed and continues to fail to maintain accessible features on pedestrian rights of way throughout Philadelphia due to its lack of adequate policies and procedures to (1) prevent pervasive obstruction by objects such as parked vehicles, trash cans, sandwich boards, and sidewalk seating; (2) remove snow in a reasonable manner; and (3) prevent construction zones from blocking paths of travel without providing adequate alternate routes.

124.    The regulations implementing Title II of the ADA further require public entities to provide and maintain accessibility for temporary facilities, including but not limited to, "temporary safe pedestrian passageways around a construction site." 28 C.F.R. 36 App. A. 4.1.1(4).

125.    Defendant has violated Title II of the ADA by failing to provide safe and usable alternate accessible routes for pedestrians with mobility and vision impairments when providing temporary pedestrian routes due to construction that limits access to existing pedestrian routes.

126.    As a direct and proximate result of the aforementioned acts, Plaintiffs have been and continue to be injured.

127.    The City's conduct constitutes an ongoing and continuous violation of Title II of the ADA and, as a result, Plaintiffs are entitled to declaratory and injunctive relief as well as reasonable attorneys' fees and costs.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## SECOND CAUSE OF ACTION
## VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973
### (29 U.S.C. § 794, *et seq.*)

128.    Plaintiffs re-allege and incorporate herein all previously alleged paragraphs of the Complaint.

129.    Section 504 of the Rehabilitation Act provides in pertinent part: "[N]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance . . ." 29 U.S.C. § 794.

130.    Named Plaintiffs and the board members and consumers of the organizational Plaintiffs are qualified to participate in Defendant's pedestrian right of way program in Philadelphia and have disabilities within the meaning of Section 504. *See* 29 U.S.C. § 705(20)(B) (referencing 42 U.S.C. § 12102); *see also* 28 C.F.R. § 39.103.

131.    The City is a recipient of federal financial assistance sufficient to invoke the coverage of Section 504 and has received such federal financial assistance at all times relevant to the claims asserted in this Complaint.

132.    The City and its agents and employees have violated and continue to violate Section 504 and the regulations promulgated thereunder by excluding Plaintiffs from participation in, denying Plaintiffs the benefits of, and subjecting Plaintiffs, based solely by

reason of their disabilities, to discrimination in the benefits and services of Defendant's pedestrian right of way program in Philadelphia.

133.     Under Section 504, a recipient of federal financial assistance must install compliant curb ramps at intersections whenever it newly constructs or alters sidewalks, streets, roads and/or highways any time after June 3, 1977. Defendant has additionally violated Section 504 by failing to construct compliant curb ramps at intersections throughout Philadelphia, where they have newly constructed or altered sidewalks, streets, roads or highways since June 3, 1977.

134.     As a direct and proximate cause of the aforementioned acts, Plaintiffs have been and continue to be injured.

135.     Defendant's conduct constitutes an ongoing and continuous violation of Section 504 and, as a result, Plaintiffs are entitled to declaratory and injunctive relief as well as reasonable attorneys' fees and costs.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows, including but not limited to:

136.     An order and judgment certifying a class of all persons with disabilities or impairments that affect their mobility—including, for example, people who use wheelchairs or other mobility devices, as well as those who are blind or have low vision—and who use or will use pedestrian rights of way in the City of Philadelphia; appointing Named Plaintiffs as class representatives; and appointing Disability Rights Advocates and David Ferleger as class counsel.

137.     Declaratory judgment finding that Defendant's conduct as alleged herein has violated and continues to violate Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

138.    An order and judgment enjoining Defendant from violating Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act, and requiring Defendant to develop and implement a remedial plan to remedy such failures in order to provide meaningful access to Philadelphia's pedestrian rights of way program, including sidewalks, curb ramps, and pedestrian crossings.  At a minimum, Plaintiffs request that Defendant be enjoined to take the following actions:

a.    Ensure that pedestrian rights of way are readily accessible and usable by persons with impairments that affect mobility;

b.    Undertake prompt remedial measures to eliminate physical barriers to access to pedestrian rights of way to make such facilities accessible to Plaintiffs in accordance with federal accessibility standards;

c.    Maintain any existing accessible features of the City's pedestrian rights of way so that such features provide full usability for persons with disabilities that affect mobility;

d.    Enforce regulations prohibiting parked cars and other objects from blocking pedestrian rights of way;

e.    Develop and enforce, or enforce existing, regulations to ensure reasonable snow clearance sufficient to protect the rights of people with disabilities to use pedestrian rights of way;

f.    Ensure that all future new construction and alterations to sidewalks and streets results in the provision of pedestrian rights of way that are fully compliant with federal accessibility standards;

27

g.      Prepare a complete Self-Evaluation and a complete and publicly available

Transition Plan regarding the accessibility of existing pedestrian rights of way in compliance

with Title II of the ADA and Section 504;

139.    Pay Plaintiffs' reasonable attorneys' fees and costs; and

140.    Such other and further relief as the Court deems just and proper.


Dated:  August 26, 2019
        Philadelphia, Pennsylvania


By:     _____
        David Ferleger
        DAVID FERLEGER LAW OFFICE
        413 Johnson St.
        Jenkintown, PA 19046
        Tel: (215) 887-0123

        Maia Goodell*
        Andrea Kozak-Oxnard*
        DISABILITY RIGHTS ADVOCATES
        655 Third Avenue, 14th Floor
        New York, NY 10017-5621
        Tel: (212) 644-8644
        Fax: (212) 644-8636
        mgoodell@dralegal.org
        akozakoxnard@dralegal.org

        Meredith Weaver*
        DISABILITY RIGHTS ADVOCATES
        2001 Center Street, Fourth Floor
        Berkeley, CA 94704-1204
        Tel: (510) 665-8644
        Fax: (510) 665-8511
        Email: mweaver@dralegal.org

        *Attorneys for Plaintiffs*

        Motion to Appear *Pro Hac Vice* To Be Filed


28

# EXHIBIT A

REPRODUCTION
THE NATIONAL ARCHIVES AT PHILADELPHIA

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ELIZABETH KINNEY, et al.,      :      CIVIL ACTION

     Plaintiffs          :      No. 92-4101

        v.          :

HOWARD YERUSALIM, et al

     Defendants           CLASS ACTION

**F I L E D**

MAY 2 3 1994

MICHAEL E. KUNZ, Clerk
By _____ Dep. Clerk

## ORDER

AND NOW, this 23rd day of May 1994, to supplement this Court's February 2, 1993 ORDER, it is hereby further ORDERED that defendant, Lawrence M. Moy, Commissioner of the Philadelphia Streets Department shall by August 15, 1994 have completed the procurement contract process and issue contracts which require that within ninety (90) days of the finalization and issuance of the contracts, but not later than November 15, 1994, curb ramps or slopes be installed in accordance with the specifications in the federal regulations promulgated pursuant to the American With Disabilities Act, 42 U.S. C § 12101 et seq., at any intersection having curbs or other barriers to access, where bids for resurfacing were let after January 26, 1992.

FURTHERMORE, as defendant resurfaces streets in the future, defendant shall install said curb ramps or slopes at the time the street is resurfaced.

                                        BY THE COURT

5/24/94 xc:
S. Gold
B. Kramer
D. Russo
M. Eichert

                                BARTLE, J.