IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LIBERTY RESOURCES, INC., et al. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| THE CITY OF PHILADELPHIA, et al. | : | NO. 19-3846 |

MEMORANDUM

Bartle, J.                                    July  6, 2020

Plaintiffs Tony Brooks ("Brooks"), Liam Dougherty
("Dougherty"), Louis Olivo ("Olivo"), Fran Fulton ("Fulton"),
Liberty Resources, Inc. ("Liberty Resources"), Disabled in
Action of Pennsylvania, Inc. ("DIA-PA"), and Philadelphia ADAPT
("Philly ADAPT") have commenced this putative class action
against defendant the City of Philadelphia for violation of
Title II of the Americans with Disabilities Act ("ADA"), 42
U.S.C. §§ 12131 et seq., and Section 504 of the Rehabilitation
Act ("Rehabilitation Act"), 29 U.S.C. §§ 794 et seq.

Before the court is the motion of the City to dismiss
in part plaintiffs' complaint for failure to state a claim under
Rule 12(b)(6) of the Federal Rules of Civil Procedure.

I

When deciding a Rule 12(b)(6) motion, the court must
accept as true all factual allegations in the complaint and draw
all inferences in the light most favorable to the plaintiff.
See Phillips v. Cty. of Allegheny, 515 F.3d 224, 233 (3d Cir.

2008); Umland v. PLANCO Fin. Servs., Inc., 542 F.3d 59, 64
(3d Cir. 2008).  We must then determine whether the pleading at
issue "contain[s] sufficient factual matter, accepted as true,
to 'state a claim to relief that is plausible on its face.'"
Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl.
Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim must do
more than raise a "mere possibility of misconduct."  Fowler v.
UPMC Shadyside, 578 F.3d 203, 211 (3d Cir. 2009) (quoting Iqbal,
556 U.S. at 679).  Under this standard, "[t]hreadbare recitals
of the elements of a cause of action, supported by mere
conclusory statements, do not suffice."  Iqbal, 556 U.S. at 678.
On a motion under Rule 12(b)(6), the court may consider
"allegations contained in the complaint, exhibits attached to
the complaint, and matters of public record."  Pension Benefit
Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196
(3d Cir. 1993) (citing 5A Charles Allen Wright & Arthur R.
Miller, Federal Practice and Procedure § 1357 (2d ed. 1990)).

                              II

        Brooks, Dougherty, Olivo, and Fulton are residents of
Philadelphia who use a wheelchair or white cane for mobility
because of a disability.  Liberty Resources, DIA-PA, and Philly
ADAPT are nonprofit organizations that advocate on behalf of and
provide services for individuals with disabilities.

                             -2-

Plaintiffs allege that the City maintains its pedestrian rights of way, including sidewalks and curb ramps, in a manner that discriminates against people with disabilities affecting mobility. According to the complaint, the City's sidewalks, curb ramps, crosswalks, and other paths of pedestrian travel are in a state of severe disrepair and disintegration and fail to comply with federal law.  The City also creates or fails to remedy obstructions to pedestrian travel, including parked cars, vendor sandwich boards, trash cans, restaurant furniture, and snow piles.  These protrusions prevent the individual plaintiffs and others with disabilities from navigating the City independently and safely.

Plaintiffs further contend that the City has failed to create a plan for the remediation of barriers, known as a Transition Plan, which is required under the ADA.  In mid-2014, the City's Streets Department notified DIA-PA and Philly ADAPT that it would discontinue ramp upgrades during repaving and transition to a fully request-based system called the "Curb Ramp Partnership Program."  At that time, the City estimated that nearly 72,000 curb ramps needed to be upgraded at a cost of $7,500 per ramp but planned to dedicate only $3.2 million for ramp upgrades each year. In plaintiffs' estimate, it would take 170 years to upgrade all curb ramps in the City to compliance with the ADA given that level of funding.

-3-

Because of the alleged pedestrian barriers, the
individual plaintiffs routinely fall or sustain injuries while
trying to travel within the City.  The barriers impede plaintiffs
from engaging in many activities of daily life, including shopping,
school, work, medical appointments, and social activities.  The
organizational plaintiffs assert that they are forced to expend
additional time and resources to advocate on behalf of the disabled
community for improvements to pedestrian rights of way.

In their prayer for relief, plaintiffs seek a
declaratory judgment that the City has violated the ADA and the
Rehabilitation Act.  They also seek an order enjoining the City
from violating these statutes and requiring the City to ensure the
accessibility of the pedestrian rights of way, to remove pedestrian
barriers, to enforce regulations prohibiting parked cars and other
objects blocking pedestrian rights of way, and to complete a
Self-Evaluation and Transition Plan regarding the accessibility of
pedestrian rights of way in compliance with the ADA and the
Rehabilitation Act.

III

As stated above, plaintiffs' claims arise under Title II
of the ADA, 42 U.S.C. § 12132, and Section 504 of the
Rehabilitation Act, 29 U.S.C. § 794.  Title II of the ADA provides
that "no qualified individual with a disability shall, by reason of
such disability, be excluded from participation in or be denied the

-4-

benefits of the services, programs, or activities of a public
entity, or be subjected to discrimination by any such entity."
42 U.S.C. § 12132.  The Rehabilitation Act provides, in pertinent
part, that "[n]o otherwise qualified individual with a disability
in the United States . . . shall, solely by reason of her or his
disability, be excluded from the participation in, be denied the
benefits of, or be subjected to discrimination under any program or
activity receiving Federal financial assistance."  29 U.S.C.
§ 794(a).

     The ADA directs the Attorney General to promulgate
regulations necessary to implement Title II.  See 42 U.S.C.
§ 12134(a).  The ADA further commands that those regulations be
consistent with regulations promulgated under the Rehabilitation
Act.  Id. § 12134(b); see also Helen L. v. DiDario, 46 F.3d 325,
331 (3d Cir. 1995).  Regulations under the ADA and Rehabilitation
Act "should be accorded controlling weight unless [they are]
arbitrary, capricious, or manifestly contrary to the statute."
Yeskey v. Pa. Dep't of Corr., 118 F.3d 168, 170 (3d Cir. 1997)
(internal citations and quotation marks omitted); see also Helen
L., 46 F.3d at 331-32.

     To plead a prima facie case of discrimination under
Title II of the ADA, plaintiffs must allege that:  (1) they are
qualified individuals with disabilities; (2) they have been
excluded from participation in or denied the benefits of a program,

-5-

service, or activity, or were otherwise subjected to discrimination; and (3) that such exclusion, denial, or discrimination was because of their disabilities.  Furgess v. Pa. Dep't of Corr., 933 F.3d 285, 288–89 (3d Cir. 2019) (citing Chambers ex rel. Chambers v. Sch. Dist. Of Phila., 587 F.3d 176, 189 n.19 (3d Cir. 2009)).  Similarly, under the Rehabilitation Act, plaintiffs must allege that:  (1) they are "handicapped individual[s]"; (2) they are "otherwise qualified" for participation in a program; (3) the program receives "federal financial assistance"; and (4) they were "denied the benefits of" or "subject to discrimination" under the program.  Nathanson v. Med. College of Pa., 926 F.2d 1368, 1380 (3d Cir. 1991) (quoting Strathie v. Dep't of Transp., 716 F.2d 227, 230 (3d Cir. 1983)).  We consider ADA and Rehabilitation Act claims together because "the substantive standards for determining liability are the same."  McDonald v. Pa. Dep't of Pub. Welfare, 62 F.3d 92, 95 (3d Cir. 1995).

As noted above, plaintiffs seek to compel the City to do the following:  (1) prepare a Self-Evaluation under 28 C.F.R. § 35.105; (2) create a Transition Plan under 28 C.F.R. § 35.150(d); (3) provide program access to the pedestrian right of way under 42 U.S.C. § 12132, 28 C.F.R. §§ 35.149 and 35.150(a), and 29 U.S.C. § 794, including by ensuring that all pedestrian rights of way are readily accessible to persons with disabilities and free from

-6-

barriers such as snow, parked cars, and other objects; (4) ensure
that all future new construction and alterations to sidewalks and
streets result in the provision of pedestrian rights of way that
are fully compliant with federal accessibility standards, including
the installation of ADA-compliant curb ramps when resurfacing
streets pursuant to Kinney v. Yerusalim, 9 F.3d 1067 (3d Cir.
1993); and (5) maintain any existing accessible features of its
pedestrian rights of way under 28 C.F.R. § 35.133.  At this time,
the City does not challenge the complaint to the extent
plaintiffs allege that the City has failed to install
ADA-compliant adjacent curb ramps when resurfacing streets and
has failed to maintain accessible features of its pedestrian
rights of way.  Thus, only the first three requests for relief
are now at issue.

        We begin with the question of whether plaintiffs may
seek to compel the City to provide "program" access to the
pedestrian rights of way under 42 U.S.C. § 12132, 28 C.F.R.
§§ 35.149 and 35.150(a), and 29 U.S.C. § 794.  Plaintiffs take the
position that the pedestrian right of way system is itself a
service, program, or activity within the meaning of the ADA and the
Rehabilitation Act and that the City is therefore required to
ensure that all sidewalks, curbs, and other components of the
system are fully accessible to individuals with disabilities
affecting mobility.  In response, the City contends that

plaintiffs have failed to allege sufficiently the denial of
access to or exclusion from a City program, service, or
activity.  The City reasons that the pedestrian right of way and
its components constitute "facilities" which, under the ADA and
the Rehabilitation Act, are subject to different standards for
accessibility.[1]

Neither Title II of the ADA nor its implementing
regulations define "services, programs, or activities."  The
Rehabilitation Act defines a "program or activity" as "all of
the operations of . . . a local government."  29 U.S.C.
§ 794(b)(1)(A).  Relying on the definition under the
Rehabilitation Act, our Court of Appeals has interpreted
"services, programs, or activities" under the ADA to include
anything a public entity does.  Furgess, 933 F.3d at 289.  For
example, in Yeskey v. Pennsylvania Department of Corrections,
our Court of Appeals concluded that prison boot camps are
"services, programs, or activities" under the ADA and the
Rehabilitation Act.  118 F.3d at 170-71.  Title II of the ADA
obliges public entities to make all services, programs, and
activities accessible to persons with disabilities.  42 U.S.C.
§ 12132.  The regulations further provide that "[a] public

_____

1. At this stage of the proceedings, there is no dispute that
plaintiffs have sufficiently alleged that they are qualified
individuals with disabilities and that the City is a public
entity subject to liability under the ADA.

entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150(a).

The term "facility" is not defined in the statutory text of the ADA or the Rehabilitation Act. The regulations implementing the ADA define facilities as "all or any portion of buildings, structures, sites, complexes, equipment, rolling stock or other conveyances, roads, walks, passageways, parking lots, or other real or personal property, including the site where the building, property, structure, or equipment is located." 28 C.F.R. § 35.104.

The regulations do not "[n]ecessarily require a public entity to make each of its existing facilities accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150(a)(1). Instead, public entities must ensure the accessibility of "each service, program, or activity" through such methods as "redesign or acquisition of equipment, reassignment of services to accessible buildings, assignment of aides to beneficiaries, home visits, delivery of services at alternate accessible sites, alteration of existing facilities and construction of new facilities." 28 C.F.R. § 35.150(b) (emphasis added). As for new construction and alterations, "[e]ach facility or part of a facility constructed [or altered]

-9-

by, on behalf of, or for the use of a public entity shall be designed and constructed in such manner that the facility or part of the facility is readily accessible to and usable by individuals with disabilities, if the construction [or alteration] was commenced after January 26, 1992." 28 C.F.R. §§ 35.151(a), (b).

Thus, the regulations establish "a two-tiered process" for facilities that "distinguishes between a public entity's responsibilities concerning 'existing facilities' on the one hand, and 'new construction or alterations' on the other." Kinney v. Yerusalim, 812 F. Supp. 547, 548 (E.D. Pa. 1993). With respect to existing facilities, public entities are not required to modify every facility to provide access to individuals with disabilities but instead must operate all programs, services, and activities in a manner such that, when viewed in its entirety, each service, program, or activity is "readily accessible to and usable by individuals with disabilities." Id. (quoting 28 C.F.R. § 35.150(a)). A public entity "is not required to make structural changes in existing facilities where other methods are effective" to ensure access to services, programs, and activities. 28 C.F.R. § 35.150(b)(1). For example, if one facility hosting a service, program, or activity is inaccessible, a public entity may comply with the ADA and the Rehabilitation Act by making that service,

-10-

program, or activity available at another facility that is
accessible.  Id.; see also Tennessee v. Lane, 541 U.S. 509, 532
(2004).

        We agree with the City that the pedestrian rights of
way are facilities under the ADA and the Rehabilitation Act.
The plain language of the regulations, discussed above, create a
distinction between programs, services, and activities, and the
facilities in which such programs, services, and activities take
place.  This distinction is significant because it determines a
public entity's duties regarding accessibility.  Our Court of
Appeals has determined that streets and walkways are facilities
under the ADA and the Rehabilitation Act.  Kinney, 9 F.3d at
1071 n.3 (citing 28 C.F.R. § 35.104); see also N.J. Prot. &
Advocacy, Inc. v. Twp. of Riverside, No. 04-5914, 2006 WL
2226332, at *2-3 (D.N.J. Aug. 2, 2006).  Similarly, other Courts
of Appeals to address the issue have found that facilities are
distinguishable from the services, programs, or activities of a
public entity.[2]  See Babcock v. Michigan, 812 F.3d 531, 535-36
(6th Cir. 2016); Am. Ass'n of People with Disabilities v.

---

2.  We acknowledge that Courts of Appeals in other circuits have
held that pedestrian rights of way are services, programs, or
activities.  See Frame v. City of Arlington, 657 F.3d 215,
225-28 (5th Cir. 2011); Barden v. City of Sacramento, 292 F.3d
1073, 1076 (9th Cir. 2002).  We do not find these cases
persuasive, and in light of Kinney v. Yerusalim they are not
controlling here.  See 9 F.3d 1071 n.3 (citing 28 C.F.R.
§ 35.104).

Harris, 647 F.3d 1093, 1108 (11th Cir. 2011).  Treating
pedestrian rights of way as themselves a program, service, or
activity would render superfluous the exception in the
regulations which provide that a public entity need not make
every facility accessible and thus would contradict the clear
language of the regulations.  See 28 C.F.R. § 35.150(a)(1).  In
so ruling, we emphasize that the City concedes that it is
required under the ADA and the Rehabilitation Act to modify
existing facilities where necessary to provide access to a
specific service, program, or activity, and also to ensure that
facilities such as sidewalks and curbs are accessible when newly
constructed or altered, including during the resurfacing of
streets.  The City also concedes that it is required to maintain
sidewalks, curbs, and other facilities to the extent such
facilities are required under the ADA and the Rehabilitation Act
to be accessible, that is, the facilities were built or altered
after January 26, 1992 or are necessary to provide access to a
specific service, program, or activity.  See 28 C.F.R.
§§ 35.133(a) and 35.150(a)(1).

        Accordingly, the motion of the City to dismiss
plaintiffs' complaint will be granted to the extent plaintiffs
allege that the City's failure to maintain pedestrian rights of
way itself constitutes the denial of or exclusion from a City
service, program, or activity.

V

The City also contends that plaintiffs' complaint should be dismissed to the extent plaintiffs seek an injunction requiring the City to undertake a Self-Evaluation and to create a Transition Plan.  Under federal regulations, the City is to conduct a city-wide assessment of the current condition of its pedestrian facilities and to create a plan for remediation of any disrepair. Specifically, the regulation requiring public entities to undertake Self-Evaluations, 28 C.F.R. § 35.105(a), provides:

> A public entity shall, within one year of the effective date of this part, evaluate its current services, policies, and practices, and the effects thereof, that do not or may not meet the requirements of this part and, to the extent modification of any such services, policies, and practices is required, the public entity shall proceed to make the necessary modifications.

The regulations further state regarding Transition Plan:

> (1)   In the event that structural changes to facilities will be undertaken to achieve program accessibility, a public entity that employs 50 or more persons shall develop, within six months of January 26, 1992, a transition plan setting forth the steps necessary to complete such changes. A public entity shall provide an opportunity to interested persons, including individuals with disabilities or organizations representing individuals with disabilities, to participate in the development of the transition plan by submitting comments. A copy of the transition plan shall be made available for public inspection.

-13-

(2)   If a public entity has responsibility or authority over streets, roads, or walkways, its transition plan shall include a schedule for providing curb ramps or other sloped areas where pedestrian walks cross curbs, giving priority to walkways serving entities covered by the Act, including State and local government offices and facilities, transportation, places of public accommodation, and employers, followed by walkways serving other areas.

(3)   The plan shall, at a minimum

(i)    Identify physical obstacles in the public entity's facilities that limit the accessibility of its programs or activities to individuals with disabilities;

(ii)   Describe in detail the methods that will be used to make the facilities accessible;

(iii)  Specify the schedule for taking the steps necessary to achieve compliance with this section and, if the time period of the transition plan is longer than one year, identify steps that will be taken during each year of the transition period; and

(iv)   Indicate the official responsible for implementation of the plan.

28 C.F.R. § 35.150(d).

Title II of the ADA and the Rehabilitation Act create a private right of action for individuals alleging discrimination by a public entity, or exclusion from participation in or denial of the benefits of services, programs,

or activities by a public entity.  42 U.S.C. § 12133; see also
Lane, 541 U.S. at 517.  A regulation implementing these
statutes, however, does not on its own create a private cause of
action.  Alexander v. Sandoval, 532 U.S. 275, 286-87, 291
(2001).  Instead, a regulation is privately enforceable only if
it prohibits conduct that the statute also forbids.  Id. at 284.
If the regulation imposes an obligation beyond what a statute
mandates, then the regulation is not privately enforceable.  Id.
at 284-85.  While our Court of Appeals has not addressed the
issue, several other Courts of Appeals have applied Sandoval to
conclude that the Self-Evaluation and Transition Plan
regulations are not privately enforceable because they impose on
public entities duties beyond what the statutes impose.  See
Lonberg v. City of Riverside, 571 F.3d 846, 851-52 (9th Cir.
2009); Iverson v. City of Boston, 452 F.3d 94, 101-02 (1st Cir.
2006); Ability Ctr. of Greater Toledo v. City of Sandusky, 385
F.3d 901, 913-15 (6th Cir. 2004).

        In response to the City's motion, plaintiffs represent
that they "do not allege any standalone claims for failure to
conduct a self-evaluation or failure to produce a transition
plan" and "do not seek relief" under these regulations.  Thus,
plaintiffs seem to concede that there is no private cause of
action to enforce the requirement to conduct a Self-Evaluation
and to develop a Transition Plan.  Instead, plaintiffs state

that their allegations regarding the Self-Evaluation and Transition Plans are "evidence of . . . discrimination" against them on the basis of their disabilities.  We agree with the City that, to the extent plaintiffs have sought an injunction requiring the City to comply with the Self-Evaluation and Transition Plan regulations, such a request must be stricken from plaintiffs' prayer for relief as no private claim in this regard exists.  In so ruling, we make no decision as to the discovery or admissibility of any evidence regarding the City's alleged lack of a Self-Evaluation and a Transition Plan.

Accordingly, the motion of the City to dismiss plaintiffs' complaint will be granted to the extent that plaintiffs seek an injunction requiring the City to create a Self-Evaluation and a Transition Plan.